UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHLEY ABNEY,
o.b.o., C.K.S., II,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

Hon. Sally J. Berens

Case No. 1:20-cv-495

**OPINION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim that her son, C.K.S., is entitled to Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment.

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. The Commissioner has found that C.K.S. is not disabled within the meaning of the Act. Plaintiff seeks review of the Commissioner's decision.

For the following reasons, the Court will **vacate and remand the matter for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards and whether there exists in the record substantial evidence supporting the decision. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and those findings are conclusive provided substantial evidence supports them. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla but less than a preponderance. *See Cohen v. Sec'y of Dept. of Health and Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker may properly rule either way without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This standard affords to the administrative decision maker considerable latitude and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

C.K.S. was born on December 18, 2012. (PageID.130.) On June 27, 2018, Plaintiff filed an application for disability benefits, asserting that C.K.S. became disabled on November 1, 2017, due to attention deficit-hyperactivity disorder (ADHD), bipolar disorder, and anger issues. (PageID.201–07, 224.) Plaintiff's application was denied, after which she requested a hearing before an Administrative Law Judge (ALJ). On June 28, 2019, ALJ Michael S. Condon held an administrative hearing at which Plaintiff testified. (PageID.76–101.) On July 24, 2019, the ALJ issued a written decision finding that C.K.S. was not disabled. (PageID.55–70.) The Appeals Council denied Plaintiff's request for review on April 13, 2020. (PageID.36.) Therefore, the ALJ's ruling became the Commissioner's final decision. *See Cook v. Comm'r of Soc. Sec.*, 480 F.3d 432,434 (6th Cir. 2007). Plaintiff subsequently initiated this civil action for judicial review pursuant to 42 U.S.C. § 405(g).

## **ANALYSIS OF THE ALJ'S DECISION**

Federal law provides that an "individual under the age of 18" will be considered disabled if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To determine whether a child satisfies this standard, the Commissioner must evaluate the claim pursuant to a three-step sequential process. 20 C.F.R. § 416.924.

In the first step, if the ALJ determines that the child is engaged in substantial gainful activity he cannot be found to be disabled. 20 C.F.R. § 416.924(b); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). If the child is not engaged in substantial gainful activity the analysis proceeds to step two, at which point the ALJ must determine whether the child has a severe impairment or combination of impairments. 20 C.F.R. § 416.924(c); *Elam*, 348 F.3d at 125.

3

If the ALJ determines that the child suffers from a severe impairment, or combination of impairments, the analysis proceeds to step three, at which point the ALJ must determine whether the impairment(s) "meet, medically equal, or functionally equal" one of the impairments identified in the Listing of Impairments. 20 C.F.R. § 416.924(d); *Elam*, 348 F.3d at 125.

The ALJ noted that, because Plaintiff was born on December 18, 2012, under the applicable regulations he was a preschooler (age 3 to attainment of age 6) on the date the application was filed and was a school-age child (age 6 to attainment of age 12) at the time of the decision. (PageID.58 (citing 20 C.F.R. § 416.926a(g)(2).) After determining that C.K.S. had not engaged in substantial gainful activity, the ALJ proceeded to the next step and found that he suffered from the following severe impairments: (1) ADHD; (2) intermittent explosive disorder; and (3) disruptive mood dysregulation disorder. (PageID.59.) The ALJ concluded that the record did not establish a diagnosis of bipolar disorder. At the third step, the ALJ determined that C.K.S.'s impairments do not, individually or in combination, meet or medically equal any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.59.) The ALJ further determined that C.K.S.'s impairments do not functionally equal in severity any impairment identified in the Listing of Impairments. (PageID.59–70.)

To determine whether a child claimant suffers from an impairment which is the functional equivalent of a listed impairment, the ALJ must evaluate how the child functions in each of six domains of functioning described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(a)–(b). To be considered disabled, the child's impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). A "marked" limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities, while an

4

"extreme" limitation is one which very seriously interferes with a child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. 416.926a(e)(2)(i). The six domains of functioning are:

    (i) acquiring and using information,

    (ii) attending and completing tasks,

    (iii) interacting and relating with others,

    (iv) moving about and manipulating objects,

    (v) caring for yourself, and

    (vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

The ALJ found that C.K.S. had no limitation in the domains of acquiring and using information, moving about and manipulating objects, caring for yourself, and health and physical well-being. The ALJ also found that C.K.S. had less-than-marked limitation in the domain of interacting and relating with others and marked limitation in attending and completing tasks. (PageID.62–70.) Accordingly, the ALJ found that C.K.S. was not disabled from the date of his application, June 27, 2018, through the date of decision.

## DISCUSSION

In her appeal, Plaintiff does not contest the ALJ's determination that C.K.S.'s impairments do not, either alone or in combination, meet or medically equal a listing. She argues, however, that the ALJ's decision as to lack of functional equivalence is not supported by substantial evidence because he should have found that C.K.S. had marked limitations in the domains of interacting and relating with others and caring for yourself.

**I.      Interacting and Relating with Others**

>  The Social Security Administration evaluates this domain as follows:
>
>  In the domain of "Interacting and relating with others," we consider a child's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others. This domain includes all aspects of social interaction with individuals and groups at home, at school, and in the community. Important aspects of both interacting and relating are the child's response to persons in authority, compliance with rules, and regard for the possessions of others. In addition, because communication is essential to both interacting and relating, we consider in this domain the speech and language skills children need to speak intelligibly and to understand and use the language of their community.
>
>  . . .
>
>  This ability is involved in a broad range of childhood activities, such as playing, learning, and working cooperatively with others, either one-on-one or in groups. To interact and relate effectively in any activity, a child must be able to recognize, understand, and respond appropriately to emotional and behavioral cues from other people. A child whose impairment(s) limits the ability to interact and relate with others may have various kinds of difficulties. For example, the child may not understand:
>
>  • How to approach other children,
>
>  • How to initiate and sustain social exchanges, and
>
>  • How to develop meaningful relationships with others.

SSR 09-5P, 2009 WL 396026, at *2 (Feb. 17, 2009). The regulations provide that, in addition to other things, a child of preschool age should be able to socialize with children as well as adults; begin to prefer playmates and to develop friendships with children of the same age; use words instead of actions for expression; and be better able to share, show affection, and offer to help. 20 C.F.R. § 416.926a(i)(2)(iii).

The ALJ found that C.K.S. has less than marked limitation in this domain. His rationale, and the evidence supporting his conclusion, are as follows:

>  The May 16, 2018 treatment plan at Arbor Circle included goals of practicing kindness and forgiveness when playing with his brother, working toward maintaining his emotional health, and finding a hobby/healthy activity to engage in

6

during the summer. The referral to home-based support was due to the claimant's lack of impulse control, aggression, and an inability to listen at home and at school (Exhibit BIF/9).

At Arbor Circle on August 9, 2018, the claimant said that some of his strengths are that he likes to play video games, to play outside in leaves, and to play with his brother (with blocks). He said he has a friend. The claimant's mother reported that the claimant's teacher had shared that the claimant will give a toy in order to make sure a peer is happy, or that the claimant will start a game to include all friends. The claimant's mother stated that the claimant is a big helper by vacuuming and taking out the trash (Exhibit Bl F).

In a letter dated September 6, 2018, the school principal described the claimant's behavior as up and down during the claimant's kindergarten school year [2018-2019]. When things are going well for the claimant, he is a charming student who is engaged in school; the claimant's teacher reported that the claimant is a pleasure to have in class. When the claimant is having difficulty, his biggest issue is anger. Anger behaviors included shouting out, getting physical with staff members a couple of times, use of inappropriate language, and trying to run out of school on more than one occasion. These behaviors definitely tended to occur in the afternoons (Exhibits B3F/l and B5F/l). Records from Spectrum Family Medicine also dated September 6, 2018, indicated that the claimant still had an anger problem and he loses his temper easily. The hyperactivity was much better (Exhibit B9F/5 - 6).

On October 5, 2018, the school principal's letter referred to a medication change a few weeks ago and, since that time, the school staff [sic] that the claimant was still struggling with his behavior on most days. At that time, the most difficult time of day was from the morning until lunchtime; the claimant's behaviors included use of inappropriate language on the bus and in school, impulsiveness, not being focused on tasks in the classroom, and sometimes being aggressive with other students and staff (Exhibit B5F/2).

A pharma-therapy evaluation on October 11, 2018 concerned symptoms associated with ADHD with increased anger and aggression reported with the use of Adderall. The claimant was oriented to person, time, place, and situation. His speech had a normal rate and rhythm. He had a cute and casually dressed appearance. The claimant's mental status coping ability reflected deficient skills. The claimant had a bright and reactive mental status affect with a pleasant and easily engaged attitude. Behavior was calm and cooperative. The claimant displayed a goal directed thought process with intact associations. Insight and judgment were poor. Memory function was intact while attention and concentration were fair. Despite being pleasant, friendly, and interactive, the claimant presented a "mad" mood (Exhibit B7F/l -4).

On November 5, 2018, the claimant was said to be "doing very well" with the switch to the medication Intuniv. He spoke with low volume speech of a normal

> rate and volume. Once again, the claimant was bright and reactive with good mental status findings, including a pleasant attitude, calm and cooperative behavior, and good attention and concentration. Insight and judgment were good. The diagnosis was ADHD (combined presentation), intermittent explosive disorder, and disruptive mood dysregulation disorder (Exhibit B7F/5 -8). There were concerns of disrespectful behaviors at home and school. The claimant acknowledged getting in trouble and leaving the classroom almost every day (Exhibit B7F/34).
>
> At school, the claimant demonstrated difficulty managing his emotions during times of frustration. If he became frustrated with a situation, the claimant had been observed to act out physically toward staff and peers. The claimant had demonstrated mood swings in the classroom in which the "trigger" was not always obvious (Exhibit B5F/5).
>
> The December 2018 IEP, while the claimant was a full-day kindergarten student, indicated that the claimant was friendly, wanted to do well, and had the ability to build relationships with others. (Exhibit B6F).
>
> By January 7, 2019, the claimant had made great progress in understanding his emotional and mental health needs. He had decreased all physical violence at home 100% and had decreased all physical violence in the classroom completely. School staff reported that, in unstructured settings, the claimant was more likely to be triggered by another. The claimant was working on this goal and requesting help in these situations (Exhibit B8F/27-28).
>
> In a March 27, 2019 letter, the claimant's kindergarten teacher and resource room teacher, described the claimant as a charming young boy who liked sports, reading, and drawing. The claimant was very creative. When he enjoyed an activity, the claimant was able to remain on task for five to seven minutes; if he was not engaged or interested, he distracted others. The claimant moved about the classroom and blurted out. He struggled to maintain personal boundaries (Exhibit B5F/3).
>
> In view of the foregoing, the undersigned concludes that the claimant's impairments, and particularly the intermittent explosive disorder and the disruptive mood dysregulation, result in a "less than marked" limitation in interacting/relating with others. At the pertinent timeframe of this decision, the claimant is between five years and approximately 6.5 years of age. The mental health, school social worker involvement and the record as a whole supports the "less than marked" limitation in interacting/relating with others. When the claimant is not having an anger outburst, he is described as bright, engaging, and pleasant.

(PageID.65–67.) The only opinion evidence in the record was the September 6, 2018 opinion by State Agency psychologist William Schirado, Ph.D., who reviewed C.K.S.'s records and found a "less than marked" limitation in interacting/relating with others. (PageID.61, 135.) Although the

8

ALJ noted that Dr. Schirado had rendered his opinion without the benefit of the hearing testimony and the additional evidence submitted after the initial determination (including C.K.S.'s school records from his Kindergarten year), he nonetheless found the opinion to be "very persuasive" because the record evidence did not warrant a departure from the opinion. (PageID.61.)

Plaintiff argues that the ALJ's analysis is not supported by substantial evidence because it fails to address evidence that demonstrates marked limitation in this area and understates the cited evidence, for example, by ignoring the consensus opinion in C.K.S.'s Individualized Education Plan (IEP) that he had difficulty managing his emotions, causing him to act out on staff and peers, and that he was eligible to receive 30 to 90 minutes of special education services per day. Plaintiff's central focus, however, is on C.K.S.'s school records which, she argues, paint a different picture of his behavior than what the ALJ portrayed. Those records show at least one incident, but in many instances several episodes, of disruptive and aggressive behavior each month during the 2018–19 school year. For example, in September, C.K.S. punched another student as they were lining up for recess (September 12); kicked a classmate, and when asked about the incident, said he choked the classmate because he would not move and the classmate kicked him, so C.K.S. kicked him back (September 13); and left the classroom without permission to go outside to the playground, hitting a staff member and using inappropriate language during the incident (September 24). (PageID.465–67.) In October, C.K.S. moved out of his seat while the bus was moving and stood in the aisle flipping students off with both hands (October 2); when asked to sit at his table due to profanity, he became upset, picked up a stool and threw it against the wall, and then pushed everything on his table onto the floor (October 4); denied a student's report of C.K.S. choking him but admitted to pushing the student (October 15); received an in-house suspension for throwing a box of books, hitting staff multiple times, and screaming at the top of his lungs (October 17);

9

refused to come in from the playground, requiring two staff to leave other students to get him off the equipment and in line, and once in line tried to bite the teacher and then tried to spit on her (October 23); and said the "F" word and pushed the teacher (October 25). (PageID.468, 469, 471–74.)

In November and December, after C.K.S. was said to be "doing quite well," he had several other incidents. For example, on November 7, he was unable to line up, and tapped other students and chased them around the playground, while refusing multiple warnings to stop and attempts to redirect his behavior. (PageID.475.) On November 7, he was sent to the Student Responsibility Center for playing with scissors and throwing crayons. (PageID.476.) On December 7, while on the bus, he refused to sit in his assigned seat and instead sat in another student's seat. C.K.S. hit and taunted the student when he tried to sit in his seat, requiring the bus driver to pull over. (PageID.479.) On December 20, he was sent to the Student Responsibility Center after he kicked another student twice while excited and running around the room. (PageID.480.) C.K.S. continued to engage in similar conduct through the end of the school year. (PageID.481–94.)

C.K.S. was also suspended four times during the year, including on October 5, for throwing objects, using obscene language, disruptive and disrespectful behavior, and punching a teacher in the stomach; on December 7 for the bus incident that day; and on May 16, for fighting and hitting a staff member in the face. (PageID.470, 478, 495.) In addition, on May 30, he was suspended from the bus for the remainder of the year for running up and down the aisle while the bus was moving and hitting another student. (PageID.495.)

The Commissioner responds that, contrary to Plaintiff's argument, the ALJ did not ignore or understate evidence bearing on this domain. For example, the Commissioner notes, the ALJ specifically mentioned Plaintiff's testimony about C.K.S. being suspended for hitting classmates

10

and running out of the building (PageID.60); summarized C.K.S.'s behaviors of anger and aggression at school, including shouting out, getting physical with staff, using inappropriate language, and trying to run out of the school on more than on occasion (PageID.66); discussed the principal's October 5, 2018 letter stating that C.K.S. was still struggling with his behavior on most days, which included inappropriate language on the bus and in school and aggressive behavior toward staff and students (PageID.66); and noted that C.K.S. acknowledged getting in trouble and leaving the classroom almost every day (PageID.66). Finally, the Commissioner notes that the ALJ recognized that C.K.S. "demonstrated difficulty managing his emotions during times of frustration," during which he acted out against students and staff. (PageID.66.)

It is well established that an ALJ is not required to discuss all of the evidence in the record, "as long as h[is] factual findings as a whole show that []he implicitly considered the record as a whole." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 730 (6th Cir. 2013); *see also Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (stating that "'an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.'") (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Although the ALJ did not specifically discuss the incidents set forth in C.K.S.'s Office Referral Forms and Bus Misconduct Referrals in precise detail, he accurately summarized the behavioral issues that C.K.S. was having at school. The ALJ confirmed that he "considered carefully all of the written evidence that is identified as Exhibits." (PageID.60.) He also mentioned that he found Plaintiff's counsel's brief, which argued that C.K.S.'s school records demonstrated marked limitation in the domain of interacting and relating to others, "not persuasive or convincing." (PageID.61 (citing PageID.279–81).) Against this evidence, the ALJ considered other evidence in the record indicating that Plaintiff related well to other students and staff during those times when he was able to manage

11

his emotions and behavior, and appropriately concluded that C.K.S. had less than a marked limitation in this domain of functioning.

Plaintiff contends that the "summary" of angry and aggressive behavior from the principal's October 5, 2018 letter fails to capture the essence of C.K.S.'s behavior because it was penned before C.K.S. committed the many assaultive and insolent acts outlined above and incurred the suspensions. Still, the ALJ also cited evidence, including the March 27, 2019 letter from C.K.S.'s Kindergarten teacher and resource room teacher describing a boy who was "charming" and "very creative" (PageID.67 (citing PageID.432)) that was generated after some of the suspensions and many of the behavioral incidents. Plaintiff's argument that the ALJ erred in relying on Dr. Schirado's opinion because Dr. Schirado did not review the school records and other evidence generated after September 6, 2018 is also unconvincing. The ALJ recognized this issue, but nonetheless found that "the record in its entirety does not warrant a departure from Dr. Schirado's opinion." (PageID.61.)

In short, Plaintiff's argument is essentially a request that the Court reweigh the evidence, which it may not do. *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) ("Our task is not to reweigh the evidence. That is solely the province of the Secretary.") (citing *Wokojance v. Weinberger*, 513 F.2d 210 (6th Cir. 1975)); *see also Rumsey v. Comm'r of Soc. Sec.*, No. 1:17-cv-749, 2018 WL 4346823, at *4 (W.D. Mich. Aug. 13, 2018), *report and recommendation adopted*, 2018 WL 4334624 (W.D. Mich. Sept. 11, 2018) ("The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence.") (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)). Even if the record could support a different result, a court must affirm an ALJ's decision that the behavior was

not "marked" (not "more than moderate") when, as here, it is supported by substantial evidence. *See Bogle*, 998 F.2d at 347.

Therefore, the Court concludes that the ALJ properly assessed this domain.

## II.     Caring for Yourself

This domain inquires how well "you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment, and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k). Examples of limitation in this domain include failing to dress or bathe on an age-appropriate basis and engaging in self-injurious behavior or ignoring safety rules. 20 C.F.R. § 416.926a(k)(3)(iii) and (iv). The relevant Social Security Ruling lists several examples of a preschool-age child's functioning in this area, including "[d]evelops more confidence in abilities (for example, wants to use toilet, feed self independently)," and "[b]egins to understand how to control behaviors that are potentially dangerous (for example, crossing street without an adult)." SSR 09-7p, 2009 WL 396029, at *5 (Feb. 17, 2009). Examples of functioning for school-age children include "[b]egins to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior," and "[d]emonstrates consistent control over behavior and avoids behaviors that are unsafe." *Id*.

The ALJ found that that C.K.S. has no limitation in this domain, stating:

> The undersigned does not find that the claimant has deficits in age-appropriate self-care tasks. For example, on January 6, 2017, at four years of age, the claimant was brushing his own teeth and dressing himself (Exhibit B2F/2).
>
> The record does not document any persistent difficulty in the ability to care for oneself in an age-appropriate manner.

(PageID.69.) Plaintiff contends that the ALJ's finding is not supported by substantial evidence because it overlooks evidence pertinent to this domain of functioning, including C.K.S.'s inability

13

to control his behavior, to understand acceptable and unacceptable behaviors, and to avoid unsafe or harmful behaviors. (ECF No. 15 at PageID.636.) Plaintiff cites his acts of hitting, choking, and kicking peers and school staff, running from the building, and walking around the bus when it is moving as evidence relating to this domain. (*Id.*)

The Commissioner responds that Plaintiff never indicated that C.K.S. could not perform all of his personal needs, noting that in an August 20, 2018 daily activity report that Plaintiff reported that he was able to care for his personal needs, (PageID.234), and in a later-filed Function Report (PageID.244), indicated that he could perform a variety of personal care activities. The Commissioner further argues that, as to the evidence Plaintiff contends the ALJ overlooked, the ALJ properly considered this evidence in his analysis of the domains of C.K.S.'s ability to attend to and complete tasks and interact and relate with others. (ECF No. 16 at PageID.649–50.)

The ALJ's failure to consider the cited evidence with regard to C.K.S.'s ability to care for himself is understandable, as Plaintiff's counsel never argued in his hearing brief that C.K.S.'s school records documented an additional marked limitation in the area of caring for yourself. Instead, counsel's sole focus was on interacting and relating with others. (PageID.279–81.) Nonetheless, SSR 09-7p explains that the domains of caring for yourself and interacting and relating with others "are related, but different from each other," with caring for yourself focusing on "a child's feelings and behavior in relation to self," and interacting and relating with others focusing on "a child's feelings and behavior in relation to other people." 2009 WL 396029, at *4. The ruling also recognizes that some impairments may cause limitations in both domains, noting, "[f]or example, a boy with Oppositional Defiant Disorder who refuses to obey a parent's instruction not to run on a slippery surface endangers himself and disrespects the parent's authority." *Id.* Finally, the ruling states that "[r]ating the limitations caused by a child's

14

impairment(s) in each and every domain that is affected is <u>not</u> 'double-weighting' of either the impairment(s) or its effects. Rather, it recognizes the particular effects of the child's impairment(s) in all domains involved in the child's limited activities." *Id.*

In this case, some of C.K.S.'s behavior could reasonably have affected functioning in both domains, including his understanding of what is right and what is wrong and what is acceptable and unacceptable behavior as part of caring for yourself. Thus, while the ALJ reasonably considered this evidence when addressing the domain of interacting and relating with others, SSR 09-7p indicates that the ALJ should have considered it under both domains.

Accordingly, this matter will be remanded so that the ALJ can more fully consider whether the evidence contained in Plaintiff's school records establishes marked limitation under this domain.

## **CONCLUSION**

For the reasons stated above, the Commissioner's decision is **vacated and the matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. An order consistent with this opinion will enter.

Dated: September 29, 2021                                     /s/ Sally J. Berens
                                                              SALLY J. BERENS
                                                              U.S. Magistrate Judge